UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
LEONIDES DUVERNY,

                              Plaintiff,


                                                      18-CV-07652 (DLC)



        -against-

HERCULES MEDICAL P.C. and HYPERION
MEDICAL P.C. and ACHILLES MEDICAL P.C.
and GEOFFREY RICHSTONE, individually,

                              Defendants.

----------------------------------------------------------------------X



## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR FRCP, RULE 56
## MOTION FOR SUMMARY JUDGMENT




**ECHTMAN & ETKIND, LLC**
**Attorney for Defendants**
**551 Fifth Avenue, 3rd Floor**
**New York, New York 10176**
**Tel.: (212) 757-2310**

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT**……………………….………………….……...1

**Point I**

**The first, second, and third causes of action are barred
by the doctrine of** *res judicata* **in that the claims
were or could have been resolved by the U.S. DOL**………………………........3

- *First, the previous action involved an adjudication on the merits*…..........5

- *Second, res judicata applies to the parties or those in privity with them.*....7

- *Third, the claims asserted in the subsequent action
  were, or could have been, raised in the prior action*…………………........7


**Point II**

**In the alternative, the first and second causes of
action should be dismissed since DUVERNY
is not owed any overtime by HYPERION MEDICAL**…………..……….........8


**Point III**

**In the alternative, the third cause of action
should be dismissed since DUVERNY was
paid her wages prior to the institution of this action**…..………………….......8


**Point IV**

**The fourth cause of action should be dismissed**…………….…………………...9

**Point V**

**The fourth cause of action should be dismissed**……………………………...…10


**Point VI**

**The sixth and seventh causes of action
should be dismissed because HYPERION
MEDICAL was not named in the EEOC Charge**...…………………………......11


**Point VII**

**Discrimination and ADA claims are analyzed
under the McDonnell Douglas burden-shifting analysis**..………..…………......12


**Point VIII**

**DUVERNY alleged in the sixth through the thirteenth causes of
action that she was subjected to discrimination; a strong inference
that no discrimination exists when the same-actor doctrine applies,
especially when the hiring and firing occurs within two years,
as was the case here; it is "simply incredible" to find that a
defendant is motivated by discrimination when the hiring and
firing occurs within two years because to do so would mean that
the person "had suddenly developed an aversion" to the protected trait**.........13


**Point IX**

**The fifth, ninth, and eleventh causes of action
should be dismissed because neither RICHSTONE,
nor HYPERION MEDICAL engaged in sex discrimination**.……………..…....…16

- *Plaintiff's hostile work environment claim should be dismissed*.……......16

- *DUVERNY's testimony is undermined by her perjury; this Court
  should consider referring this issue to the appropriate authority*.…........30

- *Only after HYPERION MEDICAL filed a police report because of DUVERNY's theft did DUVERNY complain about being harassed.*………34

- *DUVERNY's claim that she not only performed her job well, but also performed the work of three people supports the caselaw that she was not sexually harassment.*…………...…35

- *The hostile work environment claim should be dismissed.*…..……...……35

- *Plaintiff's quo pro sexual harassment claims should be dismissed.*…..….36

**Point X**

**The seventh, tenth, and twelfth causes of action should be dismissed because neither RICHSTONE, nor HYPERION MEDICAL engaged in national origin discrimination**……..…38

- *RICHSTONE has close ties to Haitians (he has a child who is Haitian).*………………………………………………41

- *DUVERNY repeatedly committed perjury during her deposition in order to falsely claim that she was subjected to national origin discrimination.*…………………………………………….…………….41

- *Pursuant to Grady v. Affliated Cent., Inc., supra, and Lowe v. J.B. Hunt Transport, Inc., supra, this Court should not only find that the same-actor doctrine applies, but also that "it is simply incredible" to find that Defendants HYPERION MEDICAL and RICHSTONE are motivated by discrimination since to do so would mean that they "had suddenly developed an aversion" to the protected trait at issue (national origin).*…………..42

**Point XI**

**The eighth cause of action should be dismissed.**…………….... ………..……......43

- *DUVERNY underwent the medical examinations/testing
  in her capacity as a patient of HYPERION MEDICAL,
  not because she was an employee.*…………………………....………..…….....45

- *DUVERNY* cannot prove that it was a
  **"but-for cause for any adverse employment action"**…..………………...45

**Point XII**

**The thirteenth cause of action should be dismissed.** ……………...…..……......47

**Point XIII**

**Defendants Hercules Medical, P.C. and
Achilles Medical, P.C. should be dismissed.**……………………...…..……...........48

**CONCLUSION**…………….…..………………………………………………….....49

# TABLE OF AUTHORITIES

## <u>Cases</u>

Page

*Bowman v. Shawnee State Univ.,*
220 F.3d 456 (6th Cir. 2000)……………...…………………………………………...17

*Brennan v. Metro. Opera Ass'n, Inc.,*
192 F.3d 310 (2d Cir. 1999) …………...…………………………………………..40

*Brown v. Henderson,*
257 F.3d 246 (2d Cir. 2001) …………...…………………………………………..17

*Burlington Indus., Inc. v. Ellerth,*
524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) …………………………………...36

*Byrnie v. Town of Cromwell, Bd. of Educ.,*
243 F.3d 93 (2d Cir. 2001) …………...…………………………………………....12

*Chandrapaul v. City Univ. of New York,*
2016 WL 1611468 (EDNY)…...…………………………………………………17

*Chin v. ABN-AMRO N. Am., Inc.,*
463 F. Supp. 2d 294 (EDNY 2006) …………...…………………………………13

*DeCintio v. Westchester County Med. Ctr.,*
807 F.2d 304 (2d Cir. 1986), *cert. denied* 484 U.S. 825 (1987). …………...……….16, 19, 35-36

*Demoret v. Zegarelli,*
451 F.3d 140 (2d Cir. 2006) …………...……………………..……………………...39

*Faragher v. City of Boca Raton,*
524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) …………...…………………………..40

*Ferrante v. American Lung Ass'n.,*
90 N.Y.2d 623, 687 N.E.2d 1308, 665 N.Y.S.2d 25 (1997) …………...………………….…….…..3

*Figueroa v. Johnson,*
648 Fed.Appx. 130 (2d Cir. 2016)(summary order) …………...………………………..36-37

*Forrest v. Brinker Intern. Payroll Co., LP,*
511 F.3d 225 (1st Cir. 2007) …………..…………………………………………………19

*Freeman v. Continental Tech. Servs., Inc.*
710 F.Supp. 328 (ND Ga. 1988)………...……………………………………………..17, 19

*Gallegos v. Brandeis School,*
189 F.R.D. 256 (EDNY 1999) …………..……………………………..….…..8-9

*Garrigan v. Ruby Tuesday, Inc.,*
2013 WL 3946223 (SDNY) …………..………………………………………...16

*Garrigan v. Ruby Tuesday, Inc.,*
2014 WL 2134613 (SDNY) …………..……………………………………...19

*Giaimo v. SHC Services, Inc.,*
2015 WL 13719516 (WDNY) …………..…………………………………4-7

*Gottlieb v. Kenneth D. Laub & Co, Inc.,*
82 N.Y.2d 457, 626 N.E.2d 29, 605 N.Y.S.2d 213 (1993) ………..………………….…..9

*Grady v. Affiliated Cent., Inc.,*
130 F.3d 553 (2d Cir. 1997), *cert. denied,* 525 U.S. 936 (1998) ………..………13-15, 40

*Greenberg v. Board of Governors of Federal Reserve System,*
968 F.2d 164 (2d Cir. 1992) …………..………………………………..……………..4, 6

*Harris v. Forklift Systems, Inc.,*
510 U.S. 17, 114 S.Ct. 367, 126 L.E.2d 295 (1993) ………..…………………………...35, 39

*Hazen Paper Co. v. Biggins,*
507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) ………..……………………17

*Huebschen v. Department of Health & Soc. Servs.,*
716 F.2d 1167 (7th Cir. 1983), *abrogated on other grounds by*
*Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002)…………..……………17,18-19

*Ioele v. Alden Press, Inc.,*
145 A.D.2d 29, 536 N.Y.S.2d 1000 (1st Dep't 1989) ………..……..….………………..3

*James v. New York Racing Association,*
233 F.3d 149 (2d Cir. 2000) …………..…………………………………………13

*Karibian v. Columbia Univ.,*
14 F.3d 773 (2d Cir. 1994) …………..………………………………………………...36-37

*Keppler v. Hinsdale Twp. High School Dist. 86,*
715 F.Supp. 862 (ND Ill. 1989) ……………..…………………………………………...17, 19

*Kohutka v. Town of Hempstead,*
994 F.Supp.2d 305, 2014 WL 320630 (EDNY) …………………………………………19

*Koster v. Chase Manhattan Bank,*
687 F.Supp. 848 (SDNY 1988)…………..…………………………………………….....19

*LeBlanc v. Great American Insurance Co.,*
6 F.3d 836 (1st Cir. 1993), *cert. denied* 511 U.S. 1018 (1994) …………..…………………………14

*Lewis v. Erie County Medical Center Corp.,*
907 F.Supp.2d 336 (WDNY 2012) ……………..……………………………………………12

*Littlejohn v. City of New York,*
795 F.3d 297 (2d Cir. 2015) ……………..………………………………………....…40

*Lowe v. J.B. Hunt Transport, Inc.*
963 F.2d 173 (8th Cir. 1992) ……………..…………………………………...13-15, 40

*Matter of Suffolk County Dep't of Soc. Svcs. v. James M,*
83 N.Y.2d 178, 630 N.E.2d 636, 608 N.Y.S.2d 940 (1994) …………….………………………..3

*Mauro v. Orville,*
259A.D.2d 89, 697 N.Y.S.2d 704 (3rd Dep't 1999),
*lv. denied* 94 N.Y.2d 759 (2000)…………………………………………………....16, 18-19

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) …………..………………………………12

*Meiri v. Dacon,*
759 F.2d 989 (2d Cir. 1985), *cert. denied* 474 U.S. 829 (1985) …………..…………..………………3

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,*
715 F.3d 102 (2d Cir. 2013) …………..………………………………………………47

*Monahan v. New York City Dept. of Corrections,*
214 F.3d 275 (2d Cir. 2000) ……………..…………………………………………....5

*Montanez v. McDean LLC,*
770 Fed.Appx. 592 (2d Cir. 2019)(summary order)…………………………………...39-40

*Mormol v. Costco Wholesale Corp.,*
364 F.3d 54 (2d Cir. 2004) …………..……………………………………………………36

*Natofsky v. City of New York,*
921 F.3d 337 (2d Cir. 2019) …………..……………………………………………………46-47

*Novak v. Waterfront Comm'n of New York Harbor,*
928 F.Supp.2d 723 (SDNY 2013) …………..……………………………………………19

*Nungesser v. Columbia University,*
244 F.Supp.3d 345 (SDNY 2017) …………..……………………………………………...16-18

*Oncale v. Sundowner Offshore Servs., Inc.,*
523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) …………..……………….…..…..17

*Papelino v. Albany Coll. of Pharmacy of Union Univ.,*
633 F.3d 81 (2d Cir. 2011) …………..…………………………………………………....17

*Patenaude v. Salmon River Central Sch. Dist.,*
2005 WL 6152380 (NDNY) …………..……………………………………………………17-18

*Petrosino v. Bell Atl.,*
385 F.3d 210 (2d Cir. 2004) …………..…………………………………………………...39

*Proud v. Stone,*
945 F.2d 796 (4th Cir. 1991) …………..…………………………………………………..14

*Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000) …………..……………………………3

*Renz. v. Grey Advertising, Inc.,*
135 F.3d 217 (2d Cir. 1997) …………..…………………………………………………...14

*Ryan v. New York Telephone Co.,*
62 N.Y.2d 494, 467 N.E.2d 487, 478 N.Y.S.2d 823 (1984) …………..…………….…...…………5

*St. Mary's Honor Ctr. v. Hicks,*
509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) …………..…………………………3, 12

*Schiano v. Quality Payroll Systems, Inc.,*
445 F.3d 597 (2d Cir. 2006) …………..…………………………….……………………36

*Succar v. Dade Cnty. Sch. Bd.*,
229 F.3d 1343 (11th Cir. 2000) …………..…………………………………………………..19

*Terry v. Ashcroft*,
336 F.3d 128 (2d Cir. 2003) …………..…………………………………………………….39

*University of Texas Southern Medical Center v. Nassar*,
570 U.S. 338, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)………………………………………..16

*Vital v. Interfaith Medical Center*,
168 F.3d 615 (2d Cir. 1999)…………..…………………………………………………..11

*Williams v. New York City Housing Authority*,
61 A.D.3d 62, 872 N.Y.S.2d 27 (1st Dep't 2009) …………..…………………………………12

*Ya-Chen Chen v. City Univ. of N.Y.*,
805 F.3d 59 (2d Cir. 2015) …………..………………………………………………...…12, 47

*Yusuf v. Vassar Coll.*
35 F.3d 709 (2d Cir. 1994) …………..……………………………………...…………..17

## <u>PREMINARY STATEMENT</u>

This memorandum of law is submitted in support of Defendants' motion for summary judgment to dismiss the federal court action.

Plaintiff Leonides Duverny ("DUVERNY") dated Defendant Geoffrey Richstone ("RICHSTONE") prior to being hired by Defendant HYPERION MEDICAL P.C. ("HYPERION MEDICAL"), a medical office that RICHSTONE is affiliated with.  After being hired, the DUVERNY/RICHSTONE relationship continued. Only after (i) RICHSTONE decided not to leave his wife for DUVERNY and (ii) HYPERION MEDICAL filed a post-termination police report against DUVERNY about her theft of a medical file, did DUVERNY fabricate the claims that are set forth in this lawsuit. No corroborating witnesses, documents or text messages exist.

The remaining Defendants (ACHILLES MEDICAL P.C. and HERCULES MEDICAL P.C.) were not operating entities and have nothing to do with the claims.

In her complaint, DUVERNY alleged thirteen causes of action:

- The alleged failure to pay overtime in violation of the Fair Labor Standards Act ("FLSA") (first cause of action),

- The alleged failure to pay overtime in violation of New York Labor Law and 12 NYCRR § 142-2.2 (second cause of action),

- The alleged failure to timely pay wages in violation of New York Labor Law §191(3) (third cause of action),

- The alleged failure to furnish wage statements on each payday in violation of New York Labor Law §195(3) (fourth cause of action),

- The alleged failure to provide a wage notice at the time of hire in violation of New York Labor Law §195(1) (fifth cause of action),

1

- Sex discrimination in violation of Title VII of the Civil Rights Act (sixth cause of action),

- National origin discrimination in violation of Title VII of the Civil Rights Act (seventh cause of action),

- Disability discrimination in violation of the ADA based upon the allegation that Plaintiff was allegedly forced to undergo a medical examination because of an actual or perceived disability (eighth cause of action),

- Sex discrimination in violation of New York State law (ninth cause of action),

- National origin discrimination in violation of New York State law (tenth cause of action),

- Gender discrimination in violation of New York City law (eleventh cause of action),

- National origin discrimination in violation of New York City law (twelfth cause of action), and

- Religious discrimination in violation of New York City law (thirteenth cause of action).[1]

DUVERNY's claims should be summarily dismissed for a variety of reasons, including (i) the overtime claims and the failure to timely pay wages were or could have been submitted by DUVERNY to the U.S. DOL, who resolved issues for her prior to the institution of this action, (ii) the remaining New York Labor Law claims lack merit, (iii) DUVERNY failed to name her employer (HYPERION MEDICAL) in her EEOC charge, and (iv) DUVERNY cannot meet her (i) *prima facie* and/or (ii) the but for or pretext burdens of proof.

---

[1]     *See* the Complaint (Exh. "2").

## <u>The standard for granting summary judgment.</u>

"The salutary purposes of summary judgment, avoiding protracted expensive and harassing trials, apply no less to discrimination cases than to ... other areas of litigation." *Ioele v. Alden Press, Inc.,* 145 A.D.2d 29, 34 (1st Dep't 1989) *(quoting Meiri v. Dacon,* 759 F.2d 989 (2d Cir. 1985)); *Ferrante v. American Lung Ass'n.,* 90 N.Y.2d 623 (1997) (summary judgment is a "highly useful device for expediting the just disposition of a legal dispute" in discrimination cases) *(quoting Matter of Suffolk County Dep't of Soc. Svcs. v. James M,* 83 N.Y.2d 178, 182 (1994)).

The United States Supreme Court has held that trial courts should not treat employment discrimination cases differently from other cases. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S. Ct. 2097, 2109 (2000); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 524, 113 S.Ct. 2742 (1993).


## Point I

### The first, second, and third causes of action are barred <br> by the doctrine of *res judicata* in that the claims <br> <u>were or could have been resolved by the U.S. DOL.</u>

DUVERNY submitted (i) the failure to timely receive wages and (ii) the failure to receive overtime at an overtime rate (time and a half) to the U.S. DOL.  She testified:

> Q. "When you prepared the complaint to the U.S. Department of Labor, was it about not being paid for that last week?"
> A   "Yes."
>
> Q    "Anything else?"
> A    "Just some of the hours and also not being paid."

3

Q    "When you say 'the hours,' what do you mean by that?"
A    "When I was looking at them, it just seemed I wasn't getting paid overtime. And I believe I had mentioned that once, now that I can recall, that I don't get paid for overtime even though I worked overtime and Dr. Richstone told me there's no overtime payment."

Q    "When you are saying you did not get paid for overtime, does that mean you were getting paid straight time or not getting paid at all?"
A    "I was getting paid.  I was getting paid straight time."

Q    "Did the U.S. Department of Labor look into that?"
A    "Yes."

*See* the DUVERNY Deposition (Exh"3") at 62, l. 25 – 63, l.25

In response to a U.S. DOL request, HYPERION MEDICAL produced its Employee Timecard Reports for the time that DUVERNY worked for it.[2]  Those Reports evidence the time worked and the money that was paid.[3]

HYPERION MEDICAL and the U.S. DOL entered into a conciliation agreement to resolve the DUVERNY claims, which led to DUVERNY receiving money from HYPERION MEDICAL in compliance with the directive of the U.S. DOL.[4]

That agreement forms the basis for the *res judicata* defense since settlements may have "preclusive effect". *Giaimo v. SHC Services, Inc.*, 2015 WL 13719516 (WDNY). In *Giaimo*, U.S. Magistrate Judge Leslie G. Foschio wrote:

> "Settlements may also have preclusive effect. [*Greenberg v. Board of Governors of Federal Reserve System*, 968 F.2d 164, 168 (2d Cir. 1992)] The preclusive effect of a settlement is measured by the intent of the parties to the settlement. *Id.*"

---

[2]    *See* the August 21, 2019 RICHSTONE Affidavit in Support (the "RICHSTONE Affidavit") at ₱23 and the Employee Timecard Reports (Exh. "8").
[3]    *Id.*
[4]    *See* RICHSTONE Affidavit in Support at ₱26 and the August 20, 2019 Etkind Affirmation (the "Etkind Affirmation") at ₱2 for the email exchange discussing same (Exh. "9")

*Giaimo,* 2015 WL 13719516 at *7.

In analyzing whether the U.S. DOL/HYPERION MEDICAL settlement has preclusive effect, the elements of a *res judicata* defense must be analyzed. *Res judicata* applies when (a) DUVERNY is considered to be bound by the U.S. DOL/HYPERION MEDICAL settlement and (b) the DUVERNY claims that are now asserted were or could have been asserted before the U.S. DOL. *Giaimo v. SHC Services, Inc., supra.* In *Giaimo,* U.S. Magistrate Judge Leslie G. Foschio wrote:

> "It is well-settled that the doctrine of *res judicata* bars certain claims in federal court based on the binding effect of a past determination in an administrative proceeding on a claim filed with the DOL. *Ryan v. New York Telephone Co.,* [62 N.Y.2d 494,] 467 N.E.2d 487, 489-90 (1984). . . .

> "*Res judicata* will bar a subsequent claim where (1) the previous action involved an adjudication on the merits, (2) the parties or those in privity with them, and (3) the claims asserted in the subsequent action were, or could have been raised in the prior action." *Monahan v. New York City Department of Corrections,* 214 F.3d 275, 284-85 (2dCir. 2000)."

> *Giaimo,* 2015 WL 13719516 at *7.

We will now analyze the factors set forth in *Giaimo* and demonstrate that *res judicata* applies to block the claims asserted in the first, second, and third causes of action.

### First, the previous action involved an adjudication on the merits.

As noted, DUVERNY's labor law complaint to the U.S. DOL led to HYPERION MEDICAL entering into a conciliation settlement of DUVERNY's labor law claims.

And as noted, "settlements may also have preclusive effect. [*Greenberg v. Board of Governors of Federal Reserve System,* 968 F.2d 164, 168 (2d Cir. 1992)]."  *Giaimo,* 2015 WL 13719516 at *7.

HYPERION MEDICAL paid money that it did not believe that it owed in order to settle the DUVERNY claims that were asserted by the U.S. DOL on behalf of DUVERNY.[5]

HYPERION MEDICAL and the U.S. DOL resolved the failure to timely pay wages prior to the institution of this action.[6] HYPERION MEDICAL had setoff the money that was due to it from a loan that was made to DUVERNY to her to help her out with her rent against the money due to DUVERNY.[7]  When HYPERION MEDICAL could not locate the loan documents and DUVERNY claimed that she did not receive a loan, the U.S. DOL and HYPERION MEDICAL settled the wage claim by HYPERION MEDICAL releasing the money to her without withholding anything for the loan; HYPERION MEDICAL released $909.00 to DUVERNY.[8]   (During discovery in this action, RICHSTONE located an instant message from DUVERNY in which she thanked him [HYPERION MEDICAL] for helping her out with the rent.[9])

---

[5]      *See* RICHSTONE Affidavit in Support at ¶28.

[6]      *Id.* at ¶¶25-29.

[7]      *Id.*

[8]      *Id. See also,* the checks (Exh. "10")(first two pages); *see also* DUVERNY Deposition (Exh. "3") at 24, l. 20 - 25 l. 10-14 (DUVENRY denied that she received any money from RICHSTONE other than $40 to compensate her for the difference between two months of a gym membership.)

[9]      *See* the text messages between RICHSTONE and DUVERNY (Exh. "5") at Bates Stamp Nos. 216-217.

HYPERION MEDICAL and the U.S. DOL also resolved the overtime claim prior to the institution of this action. HYPERION MEDICAL paid $9.00 to DUVERNY (which represents one half hour of overtime) prior to the institution of this action.[10]

### _Second, res judicata applies to the parties or those in privity with them._

DUVERNY by filing the U.S. DOL claim is deemed to be in privity with the U.S. DOL on any settlement that it may reach. *Giaimo v. SHC Services, Inc., supra.*  In *Giaimo,* U.S. Magistrate Judge Leslie G. Foschio wrote:

> "Plaintiff, by filing the Administrative Claim, was in privity with DOL, such that Plaintiff is bound by the Stipulation of Settlement."

> *Giaimo v. SHC Services, Inc.,* 2015 WL 13719516 at *8.

### _Third, the claims asserted in the subsequent action_
### _were, or could have been, raised in the prior action._

DUVERNY could have asserted each of the claims that are alleged in the first, second and third causes of action before the U.S. DOL.

Therefore, all three factors set forth in *Giaimo v. SHC Services, Inc., supra,* apply and this Court should dismiss the first, second and third causes of action based upon the doctrine of *res judicata.*

---

[10]     *See* RICHSTONE Affidavit in Support at ¶27 and Exhibit "10" (last page).

## Point II

### In the alternative, the first and second causes of action should be dismissed <u>since DUVERNY is not owed any overtime by HYPERION MEDICAL.</u>

While both federal and state law require employees to be paid overtime for work in excess of forty hours a week (*see* 29 U.S.C. 207(a)(1) and 12 NYCRR §142-2.2), *bona fide* meal periods are excluded. 29 CFR 785.19 provides:

"Bona fide meal periods are not worktime."

29 CFR 785.19

DUVERNY testified that she took half hour lunch breaks. She testified:

Q   "When you worked for the medical office, did you have breaks?"
A   "We were given a thirty-minute break to eat."

Q   "For lunch you are saying?"
A   "For lunch, yeah.  Thirty minutes."

*See* DUVERNY deposition (Exh. "3") at 58, l. 9-19.

The Employee Timecard Reports (Exh. "8") did not omit the time that DUVERNY took off for lunch. If you omit that time, DUVERNY is not owed any overtime.

Therefore, the first and second causes of action lack merit and should be dismissed.

## Point III

### In the alternative, the third cause of action should be dismissed since <u>DUVERNY was paid her wages prior to the institution of this action.</u>

New York Labor Law claims are reserved for substantive violations of the statute. *Gallegos v. Brandeis School,* 189 F.R.D. 256 (EDNY 1999).  In *Gallegos,* U.S. District Court Judge Seybert wrote:

"The New York Court of Appeals expressly has held that 'the remedies provided in section 198 [of the Labor Law] were intended to be *limited to claims based upon substantive violations of the article.'* Gottlieb v. Kenneth D. Laub & Co., Inc.,* 82 N.Y.2d 457, 463, 605 N.Y.S.2d 213, 216–17, 626 N.E.2d 29 (1993) (emphasis added). The Court of Appeals additionally held that 'the statutory remedy of an award of attorney's fees to a prevailing employee, as well as the liquidated damages remedy where a willful failure to pay wages has been established, are limited to actions for *wage claims founded on the substantive provisions of Labor Law article 6.' Id.* at 464, 605 N.Y.S.2d at 217, 626 N.E.2d 29 (emphasis added)."

*Gallegos v. Brandeis School,* 189 F.R.D. at 257.

In the third cause of action, DUVERNY is seeking statutory damages pursuant to NY Labor Law 198 for a violation that was resolved prior to the action was instituted by the U.S. DOL, who could have, but did not impose those damages on HYPERION MEDICAL.[11]

Based upon *Gallegos v. Brandeis School, supra,* and *Gottlieb v. Kenneth D. Laub & Co., Inc., supra,* this Court should dismiss this cause of action.

## Point IV

## **The fourth cause of action should be dismissed**.

In the fourth cause of action, DUVERNY alleged that Defendants failure to furnish wage statements on each payday in violation of New York Labor Law §195(3).

---

[11] *See* DUVERNY's complaint (Exh."2") at ¶80.

HYPERION MEDICAL contracted with ADP TotalSource, Inc., a professional employer organization that is part of ADP, to provide payroll services to it throughout DUVERNY's employment with HYPERION MEDICAL.[12]

ADP issued the wage statements on each payday to DUVERNY.[13]

Three of those wage statements (Exh. "11") have been produced.

Those statements evidence that HYPERION MEDICAL complied with New York Labor Law §195(3).

Therefore, the fourth cause of action lacks merit and should be dismissed.

## Point V

## The fifth cause of action should be dismissed.

In the fifth cause of action, DUVERNY alleged that Defendants failure to furnish a New York Pay Notice at the time that she was hired in violation of New York Labor Law §195(1).[14]

HYPERION MEDICAL furnished the Notice to DUVERNY, who signed it at the time she was hired.[15] In her deposition, DUVERNY acknowledged that she had received the Notice at the time she was hired.[16]

Therefore, the fifth cause of action lacks merit and should be dismissed.

---

[12]     *See* RICHSTONE Affidavit in Support at ¶¶21-22.
[13]     *Id.*
[14]     *See* DUVERNY's complaint (Exh. "2") at ¶82.
[15]     *See* the New York Pay Notice (Exh. "4") that was signed by DUVERNY.
[16]     *See* DUVERNY's Deposition at 154, l.16 – 155, l.25

**Point VI**

**The sixth and seventh causes of action should be dismissed because <u>HYPERION MEDICAL was not named in the EEOC Charge</u>.**

"A complainant must file a charge against a party with the EEOC or an authorized state agency before the complainant can sue that party in federal court under Title VII. *See* 42 U.S.C. § 2000e–5(f)(1) (limiting aggrieved party's right to sue to 'the respondent named in the charge')." *Vital v. Interfaith Medical Center,* 168 F.3d 615, 619 (2d Cir. 1999).

The sixth and seventh causes allege violations of Title VII.

DUVERNY's EEOC Charge (Exh. "12") does not name HYPERION MEDICAL.[17]

DUVERNY knew that her employer was HYPERION MEDICAL, as evidenced, *e.g.,* by her New York Pay Notice (Exh."4"), which names HYPERION MEDICAL as her employer, her resume (Exh. "13"),[18] and her own handwritten filing with the U.S. DOL concerning her wage complaint in which she identified HYPERION MEDICAL as her employer (Exh. "14").[19]

The entity named in the EEOC charge (Hercules Medical P.C.) is owned by a different doctor and has been inactive since 2008.[20]

Therefore, pursuant to *Vital v. Interfaith Medical Center, supra,* the Title VII claims should be dismissed.

---

[17]   *See* the EEOC Charge (Exh."12") and the DUVERNY Deposition (Exh. "3") at 43, l.6-13.
[18]   S*ee* DUVERNY Deposition (Exh. "3") at 7, l. 7-10.
[19]   *Id.* at 174, l. 18 – 175, l.25 in which DUVERNY identified the document but could not identify her own handwriting.
[20]   *See* RICHSTONE Affidavit at ¶¶31-32.

## Point VII

## Discrimination and ADA claims are analyzed
## under the McDonnell Douglas burden-shifting analysis.

The *McDonnell Douglas* burden-shifting analysis applies to discrimination claims:

> "Discrimination claims under Title VII, the ADA, and the NYS Human Rights Law are evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). It is the plaintiff's burden to establish a *prima facie* case of discrimination, and, if plaintiff does, a rebuttable presumption of discrimination arises and the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 102 (2d Cir.2001). If the defendant articulates a non-discriminatory reason, the presumption of discrimination drops out and the burden shifts back to the plaintiff to show that defendant's reason is actually pretext for unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)."

> *Lewis v. Erie County Medical Center Corp.*, 907 F.Supp.2d 336, 347 (WDNY 2012)

The New York City Human Rights Law ("NYCHRL") requires an independent analysis of its claims:

> "The City HRL now explicitly requires an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language."

> *Williams v. New York City Housing Authority*, 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)

Summary judgment on a NYCHRL cause of action should be granted if no reasonable jury could conclude that discrimination played a role in the defendants' actions. *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015)

## Point VIII

**DUVERNY alleged in the sixth through the thirteenth causes of action that she was subjected to discrimination; a strong inference that no discrimination exists when the same-actor doctrine applies, especially when the hiring and firing occurs within two years, as was the case here; it is "simply incredible" to find that a defendant is motivated by discrimination when the hiring and firing occurs within two years because to do so would mean that <u>the person "had suddenly developed an aversion" to the protected trait.</u>**

A strong inference that there was no discriminatory intent upon behalf of an employer applies when the same-actor doctrine applies, especially when the hiring and firing occurs within a short period of time. *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553 (2d Cir. 1997), *cert. denied,* 525 U.S. 936 (1998); when the same-actor doctrine applies, it is "simply incredible" to find that a defendant is motivated by discrimination when the hiring and firing occurs within two years because to do so would mean that the person "had suddenly developed an aversion" to the protected trait. *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992); *Chin v. ABN-AMRO N. Am., Inc.,* 463 F. Supp. 2d 294, 303 (E.D.N.Y. 2006) (no inference of discrimination where plaintiff was member of protected class when hired); *James v. New York Racing Association,* 233 F.3d 149 (2d Cir. 2000) (no inference of discrimination where plaintiff had been promoted while in the protected class).

In *Grady,* the Second Circuit, Court of Appeals, wrote:

> "Although each case must involve an examination of all the circumstances, some factors strongly suggest that invidious discrimination was unlikely. **For example, when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to**

**hire. This is especially so when the firing has occurred only a short time after the hiring.** *See, e.g., LeBlanc v. Great American Insurance Co.,* 6 F.3d 836, 847 (1st Cir.1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994); *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992); *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir.1991) ("[I]n cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer."). *See also Renz v. Grey Advertising, Inc.,* 135 F.3d 217,[221-222] (2d Cir. Aug. 4, 1997) (erroneous jury instruction requiring finding that age was "the real reason" for termination did not prejudice age-discrimination plaintiff where, *inter alia,* the allegedly biased supervisor who terminated plaintiff's employment had selected her to work in his group less than two years earlier)."

*Grady v. Affiliated Cent., Inc.,* 130 F.3d at 561.

*Grady v. Affliated Cent., Inc.* cited with approval to *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174–75 (8th Cir.1992). *Id.*

In *Lowe,* the Eighth Circuit, Court of Appeals, noted that when the same-actor doctrine applied and the hiring and firing occurs within two years, "it is simply incredible" to find that the defendant is motivated by discrimination since to do so would mean that the person "had suddenly developed an aversion" to the protected trait (sex, national origin, disability, etc.):

"The evidence that plaintiff claims is inconsistent with defendant's proffered justification is thin, but perhaps sufficient, all other things being equal, to defeat a motion for directed verdict. In the present case, however, all other things were not equal. The most important fact here is that plaintiff was a member of the protected age group both at the time of his hiring and at the time of his firing, and that the same people who hired him also fired him. See *Proud v. Stone,* 945 F.2d 796 (4th Cir.1991). If plaintiff had been forty when he was hired, and sixty-five when he was fired, obviously this fact would not be so compelling. But here, the lapse of time was less than two years. **It is simply incredible**, in light of the weakness of plaintiff's evidence otherwise, **that the company officials who hired him at age fifty-one had**

**suddenly developed an aversion to older people less than two years later."**

*Lowe,* 963 F.2d at 174–75. Emphasis added.

In paragraph 11 of the DUVERNY complaint, DUVERNY alleged that RICHSTONE hired and fired her.[21] DUVERNY acknowledged that that was the case during her deposition.[22]

DUVERNY worked for HYPERION MEDICAL for six months: from November 2, 2015 through May 10, 2016.[23]

Therefore, pursuant to *Grady v. Affliated Cent., Inc., supra,* and *Lowe v. J.B. Hunt Transport, Inc., supra,* this Court should not only find that the same-actor doctrine applies, but also that "it is simply incredible" to find that Defendants HYPERION MEDICAL and RICHSTONE are motivated by discrimination since to do so would mean that they "had suddenly developed an aversion" to the protected trait at issue (sex, national origin, disability, etc.)

---

[21]     *See* the Complaint (Exh. "2") at ¶¶11 and 15.
[22]     *See* the DUVERNY deposition (Exh. "3") at 44, l. 18 to 45, l.2.
[23]     *See* the RICHSTONE Affidavit at ¶12.  *See also* the Complaint (Exh."2") at ¶15 (which mentions effectively the same thing – the Complaint is inaccurate as to the date of hire: it alleged she was hired on October 26, 2015, instead of November 2, 2015).

## Point IX

### The fifth, ninth, and eleventh causes of action should be dismissed because neither RICHSTONE, nor HYPERION MEDICAL engaged in sex discrimination.

Sex discrimination claims consist of (a) sexual harassment by reason of a hostile work environment and/or (b) *quid pro quo* sexual harassment. *DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304, 307 (2d Cir. 1986), *cert. denied* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987).

### A. *Plaintiff's hostile work environment claim should be dismissed.*

"**It is well established in this Circuit that the termination of a voluntary romantic relationship cannot form the basis of a sex discrimination suit under Title VII. *DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304, 306 (2d Cir. 1986)**." *Garrigan v. Ruby Tuesday, Inc.*, 2013 WL 3946223, *3 (SDNY)(U.S. District Court Judge George B. Daniels)(emphasis added); *Cf. Nungesser v. Columbia University,* 244 F.Supp.3d 345 (SDNY 2017)(same), *Mauro v. Orville,* 259 A.D.2d 89, 697 N.Y.S.2d 704 (3rd Dep't 1999), *lv. denied* 94 N.Y.2d 759 (2000)(same – applying NY Executive Law § 296).

*Nungesser* is the well-publicized Columbia University case in which a female student accused a person of raping her and, then, wore a mattress on her back throughout her senior year; the alleged rapist sued for sexual harassment under Title IX; Title IX cases require the same proof as a Title VII cases and, therefore, courts apply Title VII caselaw to Title IX claims; on a FRCP, Rule 12 motion, the Hon. Gregory H. Woods dismissed the alleged rapist's complaint ruling that a failed personal relationship does not form the

basis of a sexual harassment claim since the claims arise out of personal animus, not discrimination. In *Nungesser,* U.S. District Court Judge Gregory H. Woods wrote:

> "It is also well established that courts interpret 'Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII.' *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (citations omitted); *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) ('[A] Title IX sex discrimination claim requires the same kind of proof required in a Title VII sex discrimination claim ... [and] a Title IX hostile education environment claim is governed by traditional Title VII hostile environment jurisprudence.' (internal quotation marks and citations omitted)). . . .
>
> "Harassment, 'even harassment between men and women' is not automatically considered to be gender-based discrimination 'merely because the words used have sexual content or connotations.' *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). In order to be considered gender-based harassment, the harassing conduct must 'support an inference of discrimination on the basis of sex.' *Id.*; *see Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (holding plaintiff was not subjected to a hostile environment for purposes of Title VII because '[w]hile he may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender.'); *cf. Yusuf*, 35 F.3d at 714 (stating that Title IX bars a university from taking adverse action against a student 'where gender is a motivating factor in the decision'); *Chandrapaul* [*v. City of New York*], 2016 WL 1611468 [(EDNY)], at *17 ('[A 'disparate treatment claim cannot succeed' unless the plaintiff's 'protected trait actually played a role in' and had a 'determinative influence' on the adverse action.' (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993))).
>
> **"In evaluating whether actions against a particular plaintiff were discriminatory, 'courts have consistently emphasized that the ultimate issue is the reasons for the *individual plaintiff's* treatment. . . .' *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)** (affirming grant of summary judgment to defendants in Title VII case where female plaintiff was subjected to 'highly cruel and vulgar' harassment, but harassment did not reflect an attack on plaintiff as a woman).
>
> **"'In other words, was Plaintiff being harassed because of [his or] her gender or for some other reason?'** *Patenaude v. Salmon River Central Sch.*

> *Dist.,* 3:03–cv–1016, 2005 WL 6152380, at *5 (N.D.N.Y. Feb. 16, 2005)."

> "In dismissing [plaintiff]'s [original complaint], the Court held that he had "fail[ed] to plead facts giving rise to a plausible inference that [the student]'s actions were *motivated* by his gender." *Nungesser I,* 169 F.Supp.3d at 366." . . . .

> "To the extent that [the student who wore the mattress on her back]'s activism was aimed at [the plaintiff], the [complaint] specifically alleges that it was because of *his conduct* toward her (whether because of his rejection of her, as he alleges, or because of the rape that she maintained had occurred) and her resulting personal animus against him, not because of *his status* as a male."

> Therefore, the amended complaint is dismissed.

> *Nungesser,* 244 F.Supp.3d at 361, 362-363 (*Italics* – emphasis in the original; bold – emphasis added).

Likewise, in *Mauro v. Orville, supra,* the Supreme Court, Appellate Division, Third Department, cited *DeCinto* and wrote that since the language of Title VII and NY Executive Law § 296 are nearly identical,  Title VII caselaw is applied to NY Executive Law § 296 claims; discrimination based upon a failed relationship does not constitute discrimination under NY Executive Law § 296 – an employee who has a voluntary relationship with her supervisor "removes an element of her employment relationship from the workplace" and, therefore, does not have the right to react to responses thereto by claiming that they do not belong in an employment setting:

> "The statutory term 'sex' is to be taken as synonymous with 'gender' and does not include such concepts as 'sexual activity', 'sexual liaisons' or 'sexual attractions' (*see, De Cintio v. Westchester County Med. Ctr.,* 2d Cir., 807 F.2d 304, 306, *cert. denied* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50).

> "Discrimination against an employee on the basis of a failed voluntary sexual relationship does not of itself constitute discrimination because of sex (*see, Huebschen v. Department of Health & Soc. Servs.,* 7th Cir., 716 F.2d

1167, 1172 [(7th Cir. 1983), *abrogated on other grounds, Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)]; *Keppler v. Hinsdale Twp. High School Dist. 86*, 715 F.Supp. 862, 868–869 [(ND Ill. 1989)]; *Freeman v. Continental Tech. Servs.*, 710 F.Supp. 328[(ND Ga. 1988)]; *Koster v. Chase Manhattan Bank*, 687 F.Supp. 848 [(SDNY)]).

"Rather, **[a]n employee who chooses to become involved in an intimate affair with her employer . . . removes an element of her employment relationship from the workplace, and in the realm of private affairs people do have the right to react to rejection, jealousy and other emotions which [the Human Rights Law] says have no place in the employment setting** (*Keppler v. Hinsdale Twp. High School Dist. 86, supra,* at 869)."

*Mauro*, 259A.D.2d at 92, 697 N.Y.S.2d at 707-708 and n. 3.   Emphasis added.[24]

These decisions do not leave a victim without a remedy.   The attacker can be prosecuted criminally and sued for, *inter alia,* assault and battery.

---

[24]     In 2014, it was then noted that this issue had not been resolved in the Second Circuit with some District Court decisions distinguishing the strong language found in *DeCintio v. Westchester County Med. Ctr.,* 807 F.2d 304 (2d Cir. 1986) and, then, overlooking the former personal relationship, if the alleged harasser was informed that he/she should stop it.   *Garrigan v. Ruby Tuesday, Inc.,* 2014 WL 2134613 (SDNY)("*Garrigan II*").   In *Garrigan II,* U.S. District Court Judge Lorna G. Schofield noted:

> "When unwanted sexual conduct occurs after the termination of a consensual relationship, some courts, including Judge Daniels in [*Garrigan v. Ruby Tuesday, Inc.,* 2013 WL 3946223 (SDNY)], have concluded that such conduct is not gender based under Title VII. This issue has not been resolved within this Circuit or among the other Circuits. *Compare, e.g., Kohutka v. Town of Hempstead,* 11 Civ. 1882, 2014 WL 320630 (E.D.N.Y. Jan. 29, 2014) (harassment claim could exist 'even if the Plaintiff previously engaged in a sexual relationship with' her coworker), *and Forrest v. Brinker Intern. Payroll Co., LP,* 511 F.3d 225, 230 (1st Cir.2007) ('Nowhere does prior case law suggest that certain types of discriminatory behavior, held to constitute gender-based harassment in other cases, may not constitute gender-based harassment when the parties had previously engaged in a romantic relationship.'), *with Novak v. Waterfront Comm'n of New York Harbor,* 928 F.Supp.2d 723, 730–31 (S.D.N.Y.2013) (mistreatment by former supervisor following breakup of consensual sexual relationship, and mistreatment by other supervisors whose attitudes were affected by former supervisor's, 'while unfair and unfortunate, does not constitute Title VII sex discrimination under existing law'), *and Succar v. Dade Cnty. Sch. Bd.,* 229 F.3d 1343, 1345 (11th Cir.2000) (holding that 'harassment of [plaintiff] was motivated not by his male gender, but rather by Lorenz's contempt for [plaintiff] following their failed relationship')."

*Garrigan II,* 2014 WL 2134613 at n.1.

The present case is a fabricated sexual harassment case by a 43-year-old employee who tried to get her 80-year-old manager to leave his wife and marry her and when that failed, she has sought to enrich herself at his expense.[25]

RICHSTONE and DUVERNY had a personal relationship prior to her employment with HYPERION MEDICAL, which relationship continued throughout her short tenure at HYPERION MEDICAL (she worked there for just six months), as evidenced by the flirtatious and friendly text messages that DUVERNY sent to RICHSTONE throughout her employment with HYPERION MEDICAL.  *See infra.*

Prior to being hired by HYPERION MEDICAL, DUVERNY:

- Received free medical care from HYPERION MEDICAL,[26]

- Dated RICHSTONE by going out to at least four dinners with him,[27]

- Gave him – maybe – at least one hug,[28] (RICHSTONE claims that DUVERNY initiated and then kissed him on the lips toward the end of each date and that they fooled around in his car at the conclusion of one date.)[29]

- Texted RICHSTONE on a regular basis,[30]

- Received help with her rent from RICHSTONE (the loan was given by HYPERION MEDICAL at RICHSTONE's request),[31]

- Received help from RICHSTONE in trying to obtain a job,[32] and

---

25    *See* RICHSTONE Affidavit at ¶2.

26    *See, e.g.,* DUVERNY Deposition (Exh. "3") at 31, l. 5 – 11, 17-19 and 33, l. 8-12.

27    *See* DUVERNY Deposition (Exh. "3") at 40, l. 2

28    *Id.*at 120, l. 21-23.

29    *See* RICHSTONE Affidavit at ¶8.

30    *See* the text messages between RICHSTONE and DUVERNY (Exh. "5").

31    *Id.* at Bates Stamp Nos. 216-217.  *See also* RICHSTONE Affidavit at ¶9.

32    *See, e.g.,* DUVERNY Deposition (Exh. "3") at 38, l. 12-23.

- Received help from RICHSTONE (along with another) with obtaining her an apartment in Manhattan.[33]

During this time period, DUVERNY was actively pursuing RICHSTONE by initiating nearly every text message conversation and almost immediately responding to any messages from him; the text messages between DUVENRY and RICHSTONE also evidence that they joked about topics that DUVERNY now claims were harassing to her:

- DUVERNY texted RICHSTONE on a holiday (July 4th) and wished him a "Happy Fourth!!,"complained that the party that she was going to was a pot luck party, which meant that she had to bring something to the party, but then ended the conversation by laughing out loud apparently because she was so happy to be texting RICHSTONE:

   "Hi Doc, Happy Fourth!! Heading to Bidia's BBQ today.  Why does she ask ppl to bring food is unknown to me, but I am excited to go. Lol [Laugh out loud]."  (July 4, 2015).[34]

- RICHSTONE (who has a fondness for Jamaicans and teases them unmercifully)[35] responded the next day by making a Jamaican joke (bring Jamaican food and you will never be invited again) with DUVERNY responding within an hour by laughing out loud ("Lol . . .") at the joke:

   "Take Jamaican food. Then she will never again ask you to bring food." (July 5, 2015 at 12:09 pm)

   "Lol.  . . ." (DUVERNY's response within an hour of RICHSTONE's text).[36]

- DUVERNY then excitedly thanked RICHSTONE for inviting her out to dinner again:

   "Monday sounds great Doc! Thank you." (September 9, 2015)[37]

---

[33]    *See* DUVERNY Deposition (Exh. "3") at 21, l.25 – 22, l. 22.

[34]    *See* the text messages between RICHSTONE and DUVERNY (Exh. "5") at Bates Stamp No. 215.

[35]    RICHSTONE has a fondness for Jamaicans; *e.g.,* he has a Jamaican wife and ex-wife. *See* RICHSTONE Affidavit at ¶4.

[36]    *See* the text messages between RICHSTONE and DUVERNY (Exh. "5") at Bates Stamp No. 215.

[37]    *Id.*

- When RICHSTONE was a little late for the dinner appointment (on Monday September 14th), DUVERNY immediately responded by making a Jamaican joke that RICHSTONE was late like a Jamaican and by mimicking a Jamaican herself: "Yea [yah] man" followed by laughing out loud at her joke:

  "I'm here."

  "Soon come." (RICHSTONE response)

  "Yea [yah] Man." (first DUVERNY response)

   "Lol." (second DUVERNY response) (September 14, 2015).[38]

- On September 16, 2015, DUVERNY and RICHSTONE were engaged in late night text messaging with each other (the text messages were sent at 12:18 am) with RICHSTONE joking that DUVERNY was a Jamaican and all Jamaicans are asleep at that time; DUVERNY responded to these jokes by again laughing out loud ("Lol"), which was followed up with a smiling face (" **:)** ":

  "Did you receive it – [my resume]."

  "No, obviously.  Why are your awake at this hour? All Jamaicans have been asleep since 9 am."

  "Lol." (first DUVERNY response)

  "I will send it again tomorrow. **:)** " (second DUVERNY response)(September 16, 2015 at 12:18 am).[39]

- Thereafter, on that same day, DUVERNY emailed her resume RICHSTONE, thanked him for his help in trying to find a job for her, and, then thanked RICHSTONE for helping her with the rent:

  "I emailed it [her resume].  . . ."

---

[38]  *Id.* at Bates Stamp No. 215A.
[39]  *Id.* at Bates Stamp No. 216.

"I cannot thank u enough doc & I truly appreciate the help with the rent." (September 16, 2015 at 12:51 pm). [40]

- Meanwhile, when DUVERNY did not send her resume, RICHSTONE responded: "No resume, Bimbo."  DUVERNY's initial response was a sad face (" **:(** "), which was immediately followed up by a series of text messages, including DUVERNY making a Jamaican joke that her omission in sending the resume is the way a Jamaican acts: "Jamaican MAN" followed up with her laughing out loud ("Lol") again:

"No resume, Bimbo."

"Bimbo? **:(** "  (first DUVERNY response)

"Just sent it again." (second DUVERNY response)

"Jamaican MAN." (third DUVERNY response)

"Lol." (fourth DUVERNY response)

"Let me know if you receive it." (fifth DUVERNY response)

 (September 18, 2015 at 8:16 pm).[41]

- When DUVERNY returned from Europe, she texted RICHSTONE on Saturday that she had not heard from the person RICHSTONE had sent DUVERNY's resume to, which led to RICHSTONE offering her a job with HYPERION MEDICAL, with DUVERNY being very excited about the prospect of working with RICHSTONE:

"I'm back.  . . . I did not hear from [the person that you sent my resume to.]"

(Saturday, October 17, 2015)[42]

---

[40]     *Id.* At the time that DUVERNY testified at her deposition, the full series of text messages were not produced.

   DUVERNY, who apparently assumed that the text messages could not be located, lied repeatedly during her deposition about the text messages that she had sent.  For example, she lied that RICHSTONE did not give her any money for her rent. *See* DUVERNY Deposition (Exh. "3") at 24, l. 20 - 25 l. 10-14 (DUVENRY denied that she received any money from RICHSTONE other than $40 to compensate her for the difference between two months of a gym membership.)

[41]     *See* the text messages between RICHSTONE and DUVERNY (Exh. "5") at Bates Stamp No. 217.
[42]     *Id.* at Bates Stamp No. 218.

"I'm here [at HYPERION MEDICAL]."

"Thank You!!!" (DUVERNY excitedly thanking RICHSTONE for the job.)

"No problem." (RICHSTONE response)

(October 22, 2015)[43]

- RICHSTONE also helped DUVERNY obtain an apartment in Manhattan, which led to her texting him:

  "I have to deliver the applications [for the apartment] tomorrow. . . . I will keep you posted. Thank you for everything Doc.  call u soon."

  (October 23, 2015). [44]

In stark contrast to the friendly, laughing, and bubbly text messages from DUVERYNY to RICHSTONE during this time period, DUVERNY testified that she felt "uncomfortable" with RICHSTONE for a variety of reasons including:

- RICHSTONE "made me" take a HIV test.[45]

- RICHSTONE "forced" me to go to a Caribbean Island (which did not occur) and then "forced" me to drink wine during dinner (DUVERNY acknowledged during the deposition that she did not go to the Caribbean Island and being "forced" to drink wine meant that she was told by RICHSTONE that she should drink wine since it is healthy and that she could have left the dinner, if she wanted to.)[46]

---

[43]     *Id* at Bates Stamp No. 220.

[44]     DUVERNY also received financial help from another elderly doctor, who she has referred to as "Dr. Charles."  (Dr. Charles McGowan paid her rent ($1,950) and expenses (an additional $200) for months (if not years)).  *See* DUVERNY Deposition (Exh. "3") at 22, l. 13-20. DUVENRY claimed that she did know how old Dr. Charles is. *Id*. at 24, l. 4-6. DUVERNY and Dr. Charles are no longer dating. *Id*. at 126, l.15-22.

[45]     *Id*. at 35, l. 1-12.
[46]     *Id*. at 39, l. 24 – 41, l. 24.

After she was hired by HYPERION MEDICAL, DUVERNY:

o Dated RICHSTONE by going out to three to four dinners with him,[47]

o Took RICHSTONE up to her apartment after one such dinner ((according to DUVERNY); according to RICHSTONE, DUVERNY asked him to her apartment to have sex and was wearing a very revealing outfit when he got there)[48]

o Gave hugs to RICHSTONE on a weekly basis (according to DUVERNY),[49]

o Dated RICHSTONE by accompanying him to a book lecture,[50]

o Dated RICHSTONE by accompanying him to a car dealership,[51]

o Texted RICHSTONE a million kisses,[52]

o Texted RICHSTONE millions of hugs and kisses,[53]

o Texted RICHSTONE at 12:22 AM on a holiday (New Year's Day),[54]

o Texted RICHSTONE on February 24, 2019 – only two and a half months prior to her leaving HYPERION MEDICAL – that "it would mean much to me if you too did not turn on me,"[55]

o Texted RICHSTONE just forty days prior to her leaving HYPERION MEDICAL that "it would make more sense if you were my date,"[56]

o Texted RICHSTONE just eight days prior to her leaving HYPERION MEDICAL that she would "C you tomorrow, thank you!!!,"[57]

---

[47]   *Id.* at 108, l. 7-12.

[48]   *Id.* at 131, l. 3-17 and the RICHSTONE Affidavit at ¶¶13, 16.

[49]   *See* DUVERNY Deposition (Exh. "3") at 118, l. 14 – 21.

[50]   *Id.* at 110, l. 10-24.

[51]   *Id.* at 112, l. 21 – 113, l. 12,

[52]   *See* the text messages between RICHSTONE and DUVERNY (Exh. "5") at Bates Stamp No. 221.

[53]   *Id.* at Bates Stamp No. 224.

[54]   *Id.*

[55]   *Id.* at Bates Stamp No. 227.

[56]   *Id.* at Bates Stamp No. 228.

[57]   *Id.* at Bates Stamp No. 229.

- o  Texted RICHSTONE the day before she left HYPERION MEDICAL that she wanted to meet with him outside of the office,[58]

- o  Accepted the gift of a mattress from him,[59]

- o  Accepted the gift of a scale from him,[60] and

- o  Canceled her gym membership in order to join the same gym as RICHSTONE, with RICHSTONE paying the difference in cost between them,[61]

During this time period, the text messages between DUVENRY and RICHSTONE evidence that DUVERNY continued to actively pursue RICHSTONE by initiating nearly every text message conversation, contacting him on a holiday, asking him for references, and almost immediately responding to any messages from him, with RICHSTONE starting to pull away from the relationship by not, at times, responding to her text messages for long periods of time:

- •  Within three days after being hired, DUVERNY requested an extended lunch break and after RICHSTONE allowed it, DUVERNY responded by giving him a million kisses:

  "Just finished lunch, running down to c a place.  Will not take more than 25 minutes."

  "Take as much time as you need."

  **"Thank you a million X [kisses] Doc!!"**

  (November 6, 2015).  Emphasis added.[62]

---

[58]   *Id*.

[59]   *See* DUVERNY Deposition (Exh. "3") at 124, l. 3 – 25.

[60]   *Id*. at 131, l. 25 – 132, l. 16.

[61]   *Id*. at 24, l.24 – 25, l. 9 and 132, l. 17-24.

[62]   *See* the text messages between RICHSTONE and DUVERNY (Exh. "5") at Bates Stamp No. 221.

- When RICHSTONE complained about DUVERNY's texting, DUVERNY responded by trying to make the complaint into a joke and laughed out loud at the complaint:

  "Stop annoying me with texts. . . ." (RICHSTONE to DUVERNY)

  "Lol" (DUVERNY's response to the complaint)

  (November 5, 2015)[63]

- DUVERNY asked RICHSTONE to help her out with getting an apartment:

  "Hi Doc. Broker just asked about [the] letter again."

  (November 6, 2015)[64]

- DUVERNY asked RICHSTONE to help her out with her job search by lying about her salary and position at HYPERION MEDICAL:

  "Morning Doc.  Heading out to the interview, *see* photo"

  The photo contains a picture of the relevant portion of DUVERNY's fraudulent resume and includes the following comment from DUVERNY:

  "Using you as a reference and as Office Manager/Owner/CEO – salary is $52,000 yearly.  Thank you!!"

  (December 29, 2015)[65]

- DUVERNY wished RICHSTONE Happy New Year at 12:22 am on New Year's Day, blessed him, and sent RICHSTONE one million hugs and kisses:

  "**Happy New Year to you! Safe travel, and come home safe.  God bless you always. One million hugs and kisses.**"

  (January 1, 2016 (New Year's Day) at 12:22 am). Emphasis added.[66]

---

[63]   *Id.*

[64]   *Id.* at Bates Stamp No. 222.

[65]   *Id.* at Bates Stamp No. 223.

[66]   *Id.* at Bates Stamp No. 224.

- RICHSTONE did not respond to the New Year's Day greeting for over two weeks (until Saturday, January 16, 2016 at 9:17 pm) and then made a joke about Charles Dickens being Haitian; DUVERNY immediately responded to RICHSTONE's text messages as she generally always did:

  "bah humbug." (RICHSTONE to DUVERNY)

  "What's that?" (DUVERNY to RICHSTONE)

  "Isn't Christmas over?" (DUVERNY to RICHSTONE)

  "Charles Dickens.  Hattian (sic) writer." (RICHSTONE to DUVERNY)

  "Thought it was an expression of dislike for Christmas season" (DUVERNY to RICHSTONE)

  "I'll look him up" (DUVERNY to RICHSTONE)

  "Stop."        (RICHSTONE to DUVERNY)

  (Saturday, January 16, 2016 at 9:17 pm)[67]

- DUVERNY complained about her direct supervisor (Lisa Robinson) being temperamental because she found out that RICHSTONE had invited her to a dinner:

  "Your temperamental Lisa is yelling and Shouting at me. . . . I'm honestly under attack here & its because Lisa found out u invited me to that group dinner.  She used to be nice to me, but she doesn't like me anymore.  It all started when her and Bev [another HYPERION MEDICAL employee] asked me abt [about] the dinner. . . ."

  (February 24, 2016)[68]

- When RICHSTONE did not support DUVERNY concerning this complaint and told her to stop texting him, DUVERNY told RICHSTONE that "it would mean much [to me] if you too did not turn on me!"  The following are the relevant portions of the text messages:

---

[67]    *Id.*
[68]    *Id.* at Bates Stamp No. 225.

"Write down for me what you need to be trained in and I'll go over it with Lisa.  You can be overly aggressive, and that may have ticked Lisa off the way you did Angelita [another HYPERION MEDICAL employee]. Stop texting me!"

"I'm not aggressive.  You are the first to say that.  We both know I have done nothing to Angelita who everyone here calls the enemy and u know it. **It would mean much [to me] if you too did not turn on me!**"

(February 24, 2016). Emphasis added.[69]

- DUVERNY texted RICHSTONE just forty days left in her employment that "it would have made more sense if you were my date", but then retracted the text because she realized that RICHSTONE would object to it:

  "**It would have made more sense if you were my date,** but I guess that would be a conflict of interest. Don't reply."

  (March 30, 2016).  Emphasis added.[70]

- Just a week prior to leaving HYPERION MEDICAL, DUVERNY asked RICHSTONE to help her out with her job search by putting him down as a reference, asked him to lie about her salary, and then thanked RICHSTONE for whatever help he could provide:

  "Put you down for [a] reference as my boss & list you as [the] CEO.  Case you get a call.  . . . **C you tomw, thank you!!!!**

  "I earn $55[K] per year salary."

  (May 2, 2016). Emphasis added.[71]

- DUVERNY requested to meet with RICHSTONE outside of the office on May 9, 2016, the day before she allegedly was fired:

  "**Can we meet at HSBC corner of 87th and 3rd?**"

  (May 9, 2016). Emphasis added.[72]

---

[69]     *Id*. at Bates Stamp No. 227.
[70]     *Id*. at Bates Stamp No. 228.
[71]     *Id*. at Bates Stamp No. 229.
[72]     *Id*.

Conspicuously absent from the text messages were any complaints to RICHSTONE about his alleged harassment of her.

In her deposition, DUVERNY parroted her pre-employment testimony and claimed that RICHSTONE "forced" her to do this and that: he "forced" me to go out to dinner, he "forced" me to take medical examinations, he "forced" me to join his gym.[73]

The most serious allegation made by DUVERNY is that she claimed that in the medical office RICHSTONE touched, grabbed and/or put his finger in her vagina. DUVERNY then went on to testify that after this act occurred, RICHSTONE asked her for a hug, which she then gave him; that hug was not a *pro forma* hug; she left foundation on his shirt, which she then tried to clean up.[74]

RICHSTONE categorically denied the incident ever occurred and noted that he would have been crazy to attempt to harass DUVERNY since the office is small and is always crowded with patients and employees; if DUVERNY shouted, cried out, or called for help, people would have been there in seconds.[75]

### DUVERNY's testimony is undermined by her perjury; this Court should consider referring this issue to the appropriate authority.

DUVERNY's testimony is rife with perjury. First, in her deposition, DUVERNY lied as to who caused her the damages that she has claimed. Second, in her deposition,

---

[73]    *See* DUVERNY Deposition (Exh. "3") at 27, l. 9-20.
[74]    *Id*. at 138, l.6 – 139, l.18.
[75]    *See* RICHSTONE Affidavit at ¶20.

she lied extensively to support her national original claim.  Third, in her deposition, DUVERNY lied concerned her abdominal hernia to support her ADA claim and her damages claim.

As to the first point, DUVERNY testified that (a) RICHSTONE caused her both physical and emotional injuries, including causing her headaches that lasted for months, insomnia, stress, and chest palpitations, and (b) she left New York because of him.[76]  For example, DUVERNY testified that she left New York because of RICHSTONE to try to eliminate the physical and emotional injuries that she suffered by reason of him:

> Q   **"How long did you have these headaches for?"**
> A   **"Months.  Even when I was in Florida I still had headaches.  So I figured -- I even tried to leave the state [New York]. I left the state completely."**
>
> Q   **"It is because of this incident only?"**
> A   **"Yeah.**  I left the entire neighborhood."

*See* DUVERNY Deposition (Exh. "3") at 148, l. 8-17. Emphasis added.

Thereafter, we showed DUVERNY an affidavit (Exh. "15" (*sans* exhibits)) that she had submitted in another case in which she blamed the defendants in that case for the very same injuries that she is now blaming RICHSTONE for.[77] DUVERNY swore in that case that those defendants caused her to see the doctors that she has identified in our case and that the medication she was prescribed was because of their injuries to her, not the injuries allegedly caused by RICHSTONE.  *See infra.* In that affidavit (Exh. "15"), DUVERNY swore:

---

[76]    *See* DUVERNY Deposition (Exh. "3") at 146, l. 6-10, 147, l.8 – 150, l.25, and 158, l. 3 – 159, l.4

[77]    *Id.* at 202, l.5 – 19 in which she identified the affidavit and acknowledged that it was hers.

- **"My neighbor forcefully drove me out of my home and NYC all together. . . . I'm forced out of my unit and this creates a fear to even stay in NY."** (Exh. "15" at 1, ¶1)

- "The nuisance of [my neighbor] causes a very hustle and frazzle work environment for me and it became emotionally and physically toxic. **By mid-July 2017, my health began to get physically affected. I began to experience a bulging (sic) hernia, which caused me to get an operation."** (Exh. "15" at 4, ¶6)

- "[I had a] two-week muscle spasm pain [because of my neighbor's conduct]; [I suffered insomnia because of my neighbor;] **I tried over-the-counter melatonin;** that helps me to fall asleep. . . . [My neighbor's] conduct causes frustration, increased heartrate, and a fear of being suddenly awake. . . . **I began to suffer headaches beginning in July till now. Since then I have been in and out of the doctors primarily for pain, such as chest, breast, and headaches.** My living environment is hell. . . . **My primary care physician prescribed 500 ml Tylenol for my pain. I currently depend on drugs to sleep and for pain."** (Exh. "15" at 4-5, ¶7)

- "Other psychological damages**: as a result of [my neighbor's] intentional and unreasonable conduct, I now suffer constant headaches, nightmares combined with paranoia** (dreaming that [my neighbor] enters my home to hurt me). **Waking up scared with increased heart rates.  Because of the extreme stress, I haven't been able to function** and my motivation …has departed. In my culture, [it] is considered a weakness to need or seek counseling. **However, late August, I called to get an appointment for counseling at Metropolitan Hospital Center [to]  help cope with the stress** of not being able to work and/or focus." (Exh. "15" at 5-6, ¶10)

- "When I moved into [my apartment], I had just started a new job [at HYPERION MEDICAL] and needed to focus on training. . . . I moved in [on] 11/14/2015 and requested the transfer [to a different apartment] on 11/23/2015 [which was denied]. (Exh. "15" at 8, ¶4)

- "**This is the first time suing anyone** . . . and [my] first time in court. . . . [The landlord] has a history of violating the law. . . ." (Exh. "15" at 8, ¶6)(Emphasis added.)

Second, DUVERNY committed perjury to support her national origin claim.

As noted, at the time that DUVERNY testified at her deposition, the full series of text messages were not produced.[78]  DUVERNY, who apparently assumed that the text messages could not be located, lied repeatedly during her deposition about the text messages that she had sent.

DUVERNY lied that RICHSTONE called her a Haitian bimbo in multiple text messages.[79] In fact, in not one text message did RICHSTONE call DUVERNY a Haitian bimbo.[80]

DUVERNY also misrepresented the running joke between them, when they each referred to each other as Jamaican and/or used Jamaican phrases with each other was now harassing her.[81]

Third, DUVERNY committed perjury to support her damages claim and her ADA claim.

DUVERNY testified that she had her hernia operated upon and her breast implants removed to avoid being subjected to discrimination again:

> "I went through a process of removing anything and everything that can cause this to happen again.  For example, I went and had my breasts [implants] removed, I went and had the hernia repaired."

> *See* DUVERNY Deposition at 147, l. 22 – 148, l.3.

In the Civil Court Affidavit (Exh. "15"), DUVERNY committed perjury by lying that she began to experience a bulging (sic) hernia as a result of the actions of the

---

[78]    *See* Etkind Affirmation at ¶3.
[79]    *See* DUVERNY Deposition at 55, l. 12-17.
[80]    *See* the DUVERNY/RICHSTONE text messages (Exh. "5").
[81]    *See* DUVERNY Deposition at 56, l. 11-19.  *See also* the text messages (Exh. "5") evidencing the two of them engaging in Jamaican jokes with each other.

defendants in that lawsuit and, then, swore – <u>in contradiction to the sworn testimony in the pending case</u> – that she had the hernia operated upon because of what those defendants did to her. In the Affidavit (Exh. "15"), DUVERNY swore:

> "By mid-July 2017, my health began to get physically affected. I began to experience a bulging (sic) hernia, which caused me to get an operation."

> *See* DUVERNY's Civil Court Affidavit (Exh. "15") at page 4, ¶6.

DUVERNY's perjury undercuts the creditability of her testimony and should not go unpunished.

### *Only after HYPERION MEDICAL filed a police report because of DUVERNY's theft did DUVERNY complain about being harassed.*

After DUVERNY left HYPERION MEDICAL, she took her original medical file, which belonged to the PC.[82]   That file is the subject of HYPERION MEDICAL's counterclaim (*see* Exh. "2" for the pleadings).  When DUVERNY refused to return the file, HYPERION MEDICAL filed a police report (Exh. "7")

Only after this police report was filed did DUVERNY complain that she was subject to harassment/discrimination. The claims were only made after (i) DUVERNY realized that RICHSTONE would not marry her, and (ii) HYPERION MEDICAL reported to the police that DUVERNY had stolen her original medical file.[83] <u>There are no corroborating witnesses, documents, or text messages that support these fabricated claims.</u>

---

[82]   *See* RICHSTONE Affidavit at ¶¶42-44.
[83]   *Id.*

### *DUVERNY's claim that she not only performed her job well, but also performed the work of three people <u>supports the caselaw that she was not sexually harassment.</u>*

In assessing whether someone was sexually harassed, one item to review is "whether it unreasonably interfered with the employee's ability to do his job." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993).

DUVERNY testified that not only did she perform her job well, but also that she performed the work of three different people.  DUVERNY testified:

> Q   "Did you perform your job as a billing assistant well?
> A    "Yes, I did.". . .
>
> Q. "Other than that [discovering $40,000 or $60,000 owed to the Company that nobody knew about], did you perform your job well in other capacities as well?"
> A    "I did.  In addition to that, I was assigned triple work.  . . .  So I did do some complaining about that.  I did ask, you know, I'm not getting paid for three different titles, three different jobs.  And so basically he increased me from $17 to $18.00 an hour and hired somebody else. . . ."
>
> *See* DUVERNY Deposition at 50, l. 4-6, 51, l. 3-17.

### <u>The hostile work environment claim should be dismissed.</u>

Given the text messages, the weakness of Plaintiff's case (her only evidence consists of her testimony, which is undermined by her perjury), the claim by Plaintiff that not only did she perform her job well, but also that she performed the job of three different people, the strong inference that no discrimination occurred based upon the same-actor doctrine applying *(see* Point VIII, *supra),* with the enhanced application of that doctrine when the hiring and firing occur within two years, as was the case here (*id.),* and the sound case authority and law of *DeCintio v. Westchester County Med. Ctr.,* 807 F.2d 304

(2d Cir. 1986), *Garrigan v. Ruby Tuesday, Inc., supra; Nungesser v. Columbia University, supra,* and *Mauro v. Orville, supra*, this Court should dismiss Plaintiff's hostile work environment claim.

### B. *Plaintiff's quo pro sexual harassment claims should be dismissed.*

To state a *quid pro quo* claim, DUVENY must show a "'tangible employment action". "A tangible employment action, as defined by the Supreme Court, 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)." *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2006).

"If, however, a 'claim involves only unfulfilled threats, it should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct.' *Burlington Indus., Inc. v. Ellerth, 524 U.S.* at 754." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 604 (2d Cir. 2006).

DUEVERNY cannot make out a *prima facie* case of *quid pro quo* sexual harassment. *Figueroa v. Johnson*, 648 Fed.Appx. 130, 135 (2d Cir. 2016)(summary order). In *Figueroa,* the Second Circuit, Court of Appeals, wrote in a summary order:

> "In order to establish a prima facie case of *quid pro quo* sexual harassment, a plaintiff must present evidence (1) that he was subject to unwelcome sexual conduct, and (2) that his reaction to that conduct was then used as the basis for decisions affecting compensation, terms, conditions, or privileges of employment. *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d

Cir.1994). '**The relevant inquiry in a** *quid pro quo* **case is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances.'** *Id.* at 778."

*Figueroa v. Johnson*, 648 Fed.Appx. at 135 (summary order). Emphasis added.

In her form complaint (Exh. "2"), DUVERNY alleged that she was subjected to *quid pro quo* sexual harassment concerning her termination: she was terminated because DUVERNY allegedly rejected RICHSTONE's advances. *See* the Complaint (Exh. "2") at ¶88.[84]

This is not what DUVERNY has stated or testified to. She informed the U.S. DOL that she was terminated because she refused to undergo medical tests/examinations when the office was slow. Thereafter, she told an employer that she did not want to undergo fraudulent medical tests/examinations and when she refused, she was fired.

First, DUVERNY testified that she told the U.S. DOL that she was fired because she refused to undergo further medical examinations by HYPERION MEDICAL's doctors. She testified:

Q.    "It says, I was fired from my job because I didn't want to undress for multiple [medical] examinations when it was slow – do you see that?
A.    "I see that."

Q.    "Is that accurate as to what you told to the U.S. Department of Labor?"
A.    "That's accurate."

---

[84]    Plaintiff's counsel took a form complaint and plugged into it various facts. This is evident from the allegations made in the Complaint (Exh. "2") that were either inaccurate or inapplicable. For example, ¶79 of the Complaint discusses the alleged damages arising from a NY Labor Law violation occurring prior to February 27, 2015. DUVERNY was not employed by HYPERION MEDICAL until November 2, 2015. *See* footnote 23, *infra*.

*See* DUVERNY Deposition (Exh."3") at 179, l. 9-16. [85]

Second, within three months after her alleged termination, DUVERNY told an employer that she was terminated because she did not want to commit insurance fraud.[86] This is also what she testified to. DUVERNY testified: "I was terminated because I refused [to undergo the medical examination/tests], I felt that I did not want to contribute in having my records being part of a fraudulent transaction."[87]

Given the foregoing, the *quid pro quo* sexual harassment claim should be dismissed; no "tangible employment action" has occurred.

## Point X

### The seventh, tenth, and twelfth causes of action should be dismissed because neither RICHSTONE, nor HYPERION MEDICAL engaged in national origin discrimination.

In the seventh, tenth, and twelfth causes of action, DUVERNY alleged that she was subjected to national origin discrimination with the seventh and tenth causes of action specifically mentioning that she was subjected to a hostile work environment by reason of that alleged discrimination. *See* the Complaint (Exh. "2").

---

[85] *See* DUVERNY Deposition (Exh."3") at 179, l. 9-16.  *See also,* the U.S. Department of Wage and Hour Division, Employment Information Form (Exh. "1") at Bates Stamp No. 283.

[86] *See* Exh. "6" for the emails between DUVERNY and her future employer.

HYPERION MEDICAL disputes this incident and feels very strongly that DUVERNY's claim is a malicious slander upon its licensed medical professionals, who performed much of the work on DUVERNY without charge.  *See* RICHSTONE Affidavit at ¶41.

[87] *See* DUVERNY Deposition (Exh. "3") at 161, l. 14-18.

In *Harris v. Forklift Systems, Inc.,* 510 U.S. 17 (1993), the United States Supreme Court set forth the standard for when a hostile or abusive work environment claim violates Title VII:

> "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."

> *Harris,* 510 U.S. at 22-23.

In *Montanez v. McDean LLC,* 770 Fed.Appx. 592 (2d Cir. 2019)(summary order), the Second Circuit, Court of Appeals, recently combined a number of its Decisions to describe when a hostile work environment claim should be dismissed on summary judgment:

> "To establish a hostile work environment claim, a plaintiff must show, *inter alia*, that 'the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment.' *Petrosino v. Bell Atl.,* 385 F.3d 210, 221 (2d Cir. 2004) (internal quotation marks and brackets omitted)."

> "A '[p]laintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive.' *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir. 2006)."

> "'[A] mild, isolated incident does not make a work environment hostile.' *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir. 2003) (internal quotation marks omitted)."

> "Instead, 'the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.' Id. (internal quotation marks and emphasis omitted)."

> "[The plaintiff] failed to offer sufficient evidence of a hostile work environment. He stated that two managers . . .  made sexual jokes and comments about him and coworkers, and that [one manager] once asked

him on a date. However, 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language,' do not rise to a level constituting a hostile work environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (internal quotation marks omitted)."

"Likewise, '[i]solated, minor acts or occasional episodes do not warrant relief.' *Brennan v. Metro. Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir. 1999)."

"[The plaintiff] argues that the restaurant managers also made him clean, screamed at him in front of customers, and set him up to breach the restaurant's security system as a part of the harassment."

"But additional work and inappropriate or wrongful reprimands are insufficient to establish a hostile work environment. *See Littlejohn v. City of New York,* 795 F.3d 297, 321 (2d Cir. 2015) (allegations such as additional work, changes in schedule, removal from meetings, and wrongful reprimands were insufficient to establish a hostile work environment). . . ."

"The district court properly granted summary judgment on this claim."

*Montanez*, 770 Fed.Appx. at 594-5 (summary order).

The facts in this case evidence that (a) RICHSTONE has close ties to Haitians (he has a child who is Haitian), (b) DUVERNY repeatedly committed perjury during her deposition in order to falsely claim that she was subjected to national origin discrimination, and (c) pursuant to *Grady v. Affliated Cent., Inc., supra,* and *Lowe v. J.B. Hunt Transport, Inc., supra,* this Court should not only find that the same-actor doctrine applies, but also that "it is simply incredible" to find that Defendants HYPERION MEDICAL and RICHSTONE are motivated by discrimination since to do so would mean that they "had suddenly developed an aversion" to the protected trait at issue (DUVERNY being Haitian).

**A. _RICHSTONE has close ties to Haitians (he has a child who is Haitian)._**

DUVERNY is Haitian.[88]

RICHSTONE has child who is Haitian, who is named after him, and who he is very proud of; he is a CIA agent.[89]

DUVERNY testified that RICHSTONE invited her to his son's wedding which was occurring in the Caribbean.[90]

**B. _DUVERNY repeatedly committed perjury during her deposition in order to falsely claim that she was subjected to national origin discrimination._**

As noted, at the time that DUVERNY testified at her deposition, the full series of text messages were not produced.[91]  DUVERNY, who apparently assumed that the text messages could not be located, lied repeatedly during her deposition about the text messages that she had sent.

DUVERNY lied that RICHSTONE called her a Haitian bimbo in multiple text messages.[92] In fact, in not one text message did RICHSTONE call DUVERNY a Haitian bimbo.[93]

DUVERNY also misrepresented the running joke between them, when they each referred to each other as Jamaican and/or used Jamaican phrases with each other was

---

88      _See_ the DUVERNY complaint (Exh. "2") at ¶15.
89      _See_ RICHSTONE Affidavit at ¶3.
90      _See_ DUVERNY Deposition at 28, l. 9-18.
91      _See_ Etkind Affirmation at ¶3.
92      _See_ DUVERNY Deposition at 55, l. 12-17.
93      _See_ the DUVERNY/RICHSTONE text messages (Exh. "5").

now harassing her.[94] (As noted, RICHSTONE has a fondness for Jamaicans and teases them unmercifully; RICHSTONE has a Jamaican wife and ex-wife.)[95]

Therefore, DUVERNY's testimony is worthless, especially given the fact that there are no corroborating witnesses, documents, or text messages to support her claim.

### C. Pursuant to Grady v. Affliated Cent., Inc., supra, and Lowe v. J.B. Hunt Transport, Inc., supra, this Court should not only find that the same-actor doctrine applies, but also that "it is simply incredible" to find that Defendants HYPERION MEDICAL and RICHSTONE are motivated by discrimination since to do so would mean that they "had suddenly <u>developed an aversion" to the protected trait at issue (national origin).</u>

As noted in Point VIII, *supra*, not only does the same-actor doctrine apply, but also "it is simply incredible" to find that Defendants HYPERION MEDICAL and RICHSTONE are motivated by discrimination since to do so would mean that they "had suddenly developed an aversion" to the protected trait at issue (DUVRENY being Haitian). *Lowe v. J.B. Hunt Transport, Inc., supra.*

Therefore, this Court should grant Defendants summary judgment and dismiss the national origin causes of action.

---

[94]     *See* DUVERNY Deposition at 56, l. 11-19.  *See also* the text messages (Exh. "5") evidencing the two of them engaging in Jamaican jokes with each other.

[95]     *See* RICHSTONE Affidavit at ¶¶4-5

## Point XI

## __The eighth cause of action should be dismissed.__

In the eighth cause of action, DUVERNY alleged that she was required to undergo a medical examination because of her alleged or actual disability and that she suffered damages for the "unlawful discriminatory conduct". *See* the Complaint (Exh."2") at ¶¶97-98.

We will first look at the factual background concerning DUVERNY's medical condition and then analyze the cause of action.

DUVERNY was a patient of HYPERION MEDICAL prior to and while she was an employee.[96]

DUVERNY had a medical issue: she had an abdominal hernia that HYPERION MEDICAL discovered prior to her employment.[97]

DUVERNY decided to have that condition operated upon.[98]

Prior to having the operation, she needed to receive medical clearance for the operation. That medical clearance includes having examinations/tests performed to make sure that it is safe to operate.[99]

---

[96]     *See* DUVERNY's Deposition (Exh. "3") at 31, l. 6 – 33, l.16 (she was a patient prior to working at HYPERION MEDICAL and her abdominal hernia was discovered at that time). *See also* RICHSTONE's Affidavit at ¶¶36-37.

[97]     *Id.* at 38.

[98]     *Id.* at ¶¶36-40.

[99]     *Id.*

In her capacity as a patient, DUVERNY had agreed to undergo those medical clearance examinations/tests performed by HYPERION MEDICAL's personnel. (DUVERNY ultimately decided not to undergo some of the examinations/tests.)[100]

After she left HYPERION MEDICAL, DUVERNY had the abdominal hernia operated upon.[101]

Now, DUVERNY is trying to transform her medical condition into an ADA claim and damages for her sex, national origin, and religious discrimination claims.

As noted, prior to being shown her Civil Court Affidavit (Exh. "15") in her deposition in this action, DUVERNY committed perjury by testifying that she had her hernia operated upon and her breast implants removed in order to avoid being subjected to discrimination again. DUVERNY testified:

> "I went through a process of removing anything and everything that can cause this to happen again.  For example, I went and had my breasts [implants] removed, I went and had the hernia repaired."

> *See* DUVERNY Deposition at 147, l. 22 – 148, l.3.

Thereafter, in her deposition, we introduced DUVERNY's affidavit in her Civil Court Action.[102] In that Civil Court Affidavit (Exh. "15"), DUVERNY committed perjury by lying that she began to experience a bulging (sic) hernia as a result of the actions of the defendants in that lawsuit and, then, swore – <u>in contradiction to the sworn testimony in the pending case</u> – that she had the hernia operation because of what those defendants did to her (not RICHSTONE). In the Affidavit (Exh. "15"), DUVERNY swore:

---

100    *Id.*
101    *See* DUVERNY's Civil Court Affidavit (Exh. "15") at 4, par.6.
102    *See* Etkind Affirmation at ¶4.

"By mid-July 2017, my health began to get physically affected. I began to experience a bulging (sic) hernia, which caused me to get an operation."

*See* DUVERNY's Civil Court Affidavit (Exh. "15") at page 4, ⁋6.

With this background, the eighth cause of action should be dismissed for two different reasons: (a) DUVERNY underwent medical examinations/testing in her capacity as a patient of HYPERION MEDICAL, not as an employee, and (b) DUVERNY cannot prove that these examinations/testing was a "but-for cause for any adverse employment action". *Natofsky v. City of New York,* 921 F.3d 337, 348 (2d Cir. 2019).

### A. DUVERNY *underwent the medical examinations/testing in her capacity as a patient of HYPERION MEDICAL, not because she was an employee.*

42 U.S.C. § 12122(d)(4)(A) is entitled "Discrimination" is to designed to prevent employers from discriminating against employees by requiring them to undergo medical examinations, unless the examination is "job-related and consistent with business necessity".

DUVERNY did not undergo medical examinations/testing because she was an employee.

DUVERNY testified that between the time that she was hired (in November 2015) until the examinations/testing in May 2016 in preparation for her hernia operation, she did not undergo any medical examinations at HYPERION MEDICAL. DUVERNY testified:

Q  "Between November and May, prior to this incident, did you undergo any medical examinations at the medical office?"

A   "No. . . ."

*See* DUVERNY Deposition at 118, l. 3-6.

Therefore, DUVERNY did not undergo any medical examinations/testing because she was an employee of HYPERION MEDICAL.

Instead, HYPERION MEDICAL gave her examinations and tests in order to give her medical clearance to have her hernia operation.[103]

### B. *DUVERNY* cannot prove that it was a "but-for cause for any adverse employment action".

DUVERNY testified that her medical examination was a subterfuge so that RICHSTONE could commit a battery upon her: he allegedly inappropriately touched/grabbed her, which RICHSTONE has strenuously denied taking place.[104]

By making this claim, DUVERNY has waived the inconsistent claim that she was discriminated against by being forced to undergo the medical examination because of an actual or perceived disability. This is because the ADA requires "but for" causation. *Natofsky v. City of New York, supra.* In *Natofsky*, the Second Circuit, Court of Appeals, wrote:

> "[The United States Supreme Court] does not permit mixed-motive causation for Title VII retaliation-based claims. [*University of Texas Southern Medical Center v.*] *Nassar*, 570 U.S. [338] at 360 [(2013)]. . . .
>
> "[Based upon the analysis found in *Nassar*], we, therefore, join the conclusion reached by the Fourth, Sixth and Seventh Circuits that the ADA requires a plaintiff alleging a claim of employment discrimination to prove

---

[103]     *See* RICHSTONE Affidavit at ¶40.
[104]     *See* DUVERNY Deposition (Exh. "3") at 138, l.6 – 139, l.18.  *See* RICHSTONE's Affidavit at ¶20.

that the discrimination was the but-for cause for any adverse employment action."

*Natofsky v. City of New York,* 921 F.3d at 348.  Citations omitted.

Therefore, the eighth cause of action should be dismissed.

## Point XII

### The thirteenth cause of action should be dismissed.

In the thirteenth cause of action, DUVERNY alleges that she was discriminated against because of her religion in violation of New York City law in that she was subjected to "disparate working conditions and denying her the opportunity to work in an environment setting free of unlawful discrimination and harassment". *See* the Complaint (Exh. "2") at ¶120.

To allege a claim under the NYCHRL, "the plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 110 (2d Cir. 2013).  Courts "must be mindful that the NYCHRL is a not a general civility code." *Id.* (internal quotation marks omitted)

As noted, summary judgment on a NYCHRL cause of action should be granted if no reasonable jury could conclude that discrimination played a role in the defendants' actions. *Ya-Chen Chen v. City Univ. of N.Y.,* 805 F.3d 59, 76 (2d Cir. 2015)

DUVERNY's religious discrimination claim cannot survive this standard.   No reasonable jury could conclude that she was treated less well because of her religion or that her religion played any role in her termination.

## Point XIII

### Defendants Hercules Medical, P.C. and
### Achilles Medical, P.C. should be dismissed.

Hercules Medical, P.C. ("HERCULES") and Achilles Medical, P.C. ("ACHILLES") are inactive medical PCs who are owned by the same doctor.  That doctor does not own HYPERION MEDICAL.[105]

HERCULES has been inactive since 2008 at which time ACHILLES became the operating company.[106]

Years later, ACHILLES's sold its medical practice to HYPERION MEDICAL.[107]

Since HERCULES and ACHILLES have established a good name with various patients, the names were left up on the door with the consent of the doctor who owned those entities.[108]

This is not a basis for holding them liable for claims that concern HYPERION MEDICAL.

---

[105]    *See* RICHSTONE Affidavit at ¶¶31-34.
[106]    *Id.*
[107]    *Id.*
[108]    *Id.*

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment and dismiss the case.

Dated: August 21, 2019

<div style="margin-left: 40%;">

**Echtman & Etkind, LLC**
Counsel for Defendants

By: _____
David Etkind (DE-9805)

551 Fifth Avenue, 3rd Floor
New York, New York 10176
(212) 757-2310

</div>