**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X    18-CV-07652 (DLC)

LEONIDES DUVERNY,

                  I,

                                                                                           **DECLARATION**
            -against-                                                          **OF LEONIDES DUVERNY**

HERCULES MEDICAL P.C., and HYPERION
MEDICAL P.C., and ACHILLES MEDICAL P.C.,
and GEOFFREY RICHSTONE, individually,
,

                         Defendants.
------------------------------------------------------------------------X

I, LEONIDES DUVERNY, hereby declare under penalty of perjury as follows:

1. I am the named Plaintiff in the above referenced matter.  As such, I am fully familiar with the facts and circumstances of this matter.

2. I am Haitian American and identify as Black. I believe one of the defendants in this case, Mr. Richstone, to be Caucasian.

3. On June 28, 2014, I met Mr. Richstone the birthday party of a mutual acquaintance. Mr. Richstone introduced himself to me as a doctor, gave me his business card, and offered to help me with my job search and medical needs, free of charge.

4. At the time, I had been unemployed for nearly five years and was a financially-struggling student. I was slated to graduate in May 2015. Therefore, I needed a full-time job.

5. In or around early July 2014, I contacted Mr. Richstone to follow-up on his offer to help me with my job search. Mr. Richstone told me that he was willing to discuss job prospects with me over dinner. Believing that Mr. Richstone's invitation was solely influenced by his genuine desire to help, I agreed to meet with him for dinner.

6. In or around July 2014, Mr. Richstone and I met for dinner. During dinner, Mr. Richstone strongly urged me to drink wine. Mr. Richstone then proceeded to ask me if I wanted to go with him as his guest to his son's wedding. Before I could reply, Mr. Richstone stated that we needed to stop by his office first so that we could get birth control patches for me. Confused, I asked why I would need patches, to which Mr. Richstone shockingly replied, "In case we have sex, after all we're two adults, aren't we?"

7. Disgusted, I exclaimed that as a Christian, I would never engage in that type of activity with Mr. Richstone. Mr. Richstone then told me that "it would only be sex, I would not want you to think that we're in some form of relationship…." Mr. Richstone continued on to boast that "women have sex with him all the time." I said "I'm not those women." Defendant Richstone then berated me and said that my religion was causing me to "act foolish."

8. In or around July 2014, due to an urgent need of a free medical check-up, I contacted Mr. Richstone's office to schedule an appointment. At the appointment, Mr. Richstone did a medical check-up of me, during which he commented that my breasts looked nice. This is when Mr. Richstone became aware of my hernia.

9. Approximately one year later, after diligently looking for a job without success, I reluctantly reached out to Mr. Richstone to inquire about a position with Defendants, as I needed proof of income to rent an apartment.

10. Before hiring me, Mr. Richstone sent me a text message, dated September 18, 2015 at 8:16 p.m., stating "No resume, Bimbo[.]"

11. In or around September 2015, again before hiring me, Mr. Richstone sent me a text message stating: "Why are you awake at this hour? All Jamaicans have been asleep since 9 AM[.]"

12. After talking with Mr. Richstone a couple of times about work, he invited me to interview

with his medical practice. Even though he made me uncomfortable, after thinking about it for a while and discussing it with my boyfriend, I agreed to interview. I was then called into his office for an interview with Mr. Richstone and Lisa Robinson, who was the Office Manager. Ms. Robinson told me that I would be able to receive medical insurance through the job.

13. I was hired as a Billing Assistant and began working on or around November 2, 2015. I worked full time and was paid $17.00 per hour from the time I was hired until about January 9, 2016 when my salary increased to $18.00 per hour.

14. It was my understanding that Mr. Richstone owned and managed all aspects of the medical practice. Dr. Mamaeva only saw patients at the office once or twice a week. Although I was supervised directly by Lisa Robinson, she and I both reported to Mr. Richstone. In fact, all the employees reported to Mr. Richstone. I am also aware that the medical office used the names Hyperion Medical P.C., Hercules Medical P.C., and Achilles Medical P.C.

15. Mr. Richstone regularly and throughout my employment commented on my appearance: that my clothes were not tight enough, I had beautiful legs, I either had to gain or lose weight, I looked "decent," I was an attractive woman, and I had "nice breasts."

16. Moreover, Mr. Richstone, on a weekly basis, he asked or gestured for a hug from me, which made me feel uncomfortable. Mr. Richstone also call me a "Bimbo" and a "Haitian Bimbo."

17. Mr. Richstone also regularly and throughout my employment made harassing comments based on my religion: "You think you're self-righteous because of your religion" and "You're brainwashed by your religion."

18. Mr. Richstone also hurled degrading and offensive comments at me regarding my Haitian identity and frequently conflated Haitians and Jamaicans together.

3

19. His statements included "Haitians do not generally bathe," "Haitians are not intelligent," "Jamaicans are monkeys," and "Jamaicans are lazy."

20. In or around November 2015, Mr. Richstone ordered me and a coworker to go to a store and run errands for him. At the store, Mr. Richstone directed the coworker over the phone to purchase me a new mattress, which he insisted on paying for. I objected to this unwanted gift from him but he ignored my objections and pressured me to accept it.

21. In or around November 2015, Mr. Richstone called me "fat." Defendant Richstone then directed me to quit my gym and join his gym instead. I refused because I wanted to limit, as much as possible, any interaction with Mr. Richstone outside of the office.

22. In or around November 2015, I complained to and urged Mr. Richstone to stop his unwanted sexual advances towards me. However, Mr. Richstone did not respond to my complaint and continued his conduct.

23. On November 26, 2015, Mr. Richstone summoned me into his office, where another male doctor was present. After Mr. Richstone finished talking to me, he told me, "Walk out, so we can check you out."

24. On December 16, 2015, at an office party, Mr. Richstone, during an informal speech, urged another doctor to sing a song, which the doctor did, about Jamaicans jumping from tree to tree, eating bananas, and acting like monkeys. Mr. Richstone then referred to his Jamaican ex-father in law as a "borrower" who always needed money but never paid him back.

25. When Mr. Richstone began to introduce me, he referred to me as a "charity case."

26. From in or around January 2016 until the end of my employment, Mr. Richstone required me to give him my cellphone to him every day to prevent me from contacting my boyfriend.

27. Furthermore, throughout my employment, Mr. Richstone repeatedly asked me to go out and

4

have dinner with just him. For fear of losing my job, I felt that I had no choice but to give in. After I went to dinner with him, I felt that other office workers started to treat me differently.

28. In or around January 2016, during one of the dinners, Mr. Richstone told me that he wanted to see my apartment afterwards. I was intimidated, and did not feel I could not refuse my boss so I agreed. After dinner, Mr. Richstone and I went to my apartment. Mr. Richstone looked around it and then left.

29. In or around January 2016, Mr. Richstone gave me a scale and demanded that I take it home so that I could "control" my weight since he felt that I was getting "fat."

30. In January and February 2016, Mr. Richstone again demanded that I transfer to his gym. When I repeatedly refused, Mr. Richstone became irritated making me scared that I could lose my job. Mr. Richstone told me to cancel my gym membership and said that he was would pay the difference in the membership fees. When I cancelled my gym membership to join Mr. Richstone's gym in late February 2016, I had to approach him every month for the $20.00 difference in membership fees that he promised to pay. That made me very uncomfortable so I stopped approaching him for the money after a couple of months.

31. Throughout my employment, Mr. Richstone pressured me to go with him to non-work related events, such as a book lecture and a meeting at a car dealership. I felt pressure to attend these events and follow his orders because I wanted to keep my job. I had been unemployed for a long time before and had not found anything after a long job search. I felt that I needed the job.

32. In or around early May 2016, Mr. Richstone summoned me into his office and told me that since I received medical insurance from Defendants, I must visit all of the doctors in the

practice and undergo testing by my colleagues for a hernia operation. I told him that I did not want to undergo testing nor did I want to get the hernia operation from his office.

33. I had the hernia most of my life and I had no interested in a hernia surgery. When I had Medicaid, my doctor had offered me the same surgery and I told him no because I did not want it. I still did not want it at this time. Besides, I had my own doctor at that time, at a different medical office.

34. When I objected, Mr. Richstone said: "If you're going to work here, you must adhere to my policies, I'm in control here, you're not! You must get these exams, there is nothing more to discuss! If you do not like how things are done here, sue me!"

35. Fearful of losing my job and also because Mr. Richstone would not take no for an answer, I reluctantly gave in and agreed to undergo the examination. Mr. Richstone then directed me to go into an examination room and disrobe. Mr. Richstone started to move his hand down the front of my body. I firmly told him to move his hand higher as since my hernia was in my lower abdomen. Then, with an ungloved hand, Mr. Richstone touched my vagina. I was disgusted and moved his hand away. When Caroline Jeanty, a co-worker, unexpectedly knocked on the door, Mr. Richstone hugged me and told me to clean his shirt because my makeup got on it. I was traumatized and quickly got dressed and opened the door for the co-worker.

36. On May 10, 2016, Mr. Richstone informed me that I needed to undergo yet another physical examination with him and other male doctors. This was another exam that I never requested and did not want. I felt that Mr. Richstone and the other male doctors were going to violate me again by touching my vagina, so I strongly refused. Mr. Richstone became angry and threatened to fire me if I did not submit to his demand. I continued to refuse. In response to

my refusal, Mr. Richstone fired me.

37. I believe that I was fired because I refused to submit myself to Mr. Richstone's sexual touching again.

38. On May 11, 2016, after I was fired, I e-mailed Lisa Robinson, the office manager, to ask for my last pay check. That same day, Ms. Robinson e-mailed me that Mr. Richstone: "[T]old me this morning . . . that no other checks be given to you."

39. I did not receive my last pay check until around mid-August 2016 after I reached out to the U.S. Department of Labor, Wage and Hour Division, for assistance.

40. While I was working, I would regularly work over forty hours a week but not get paid at the overtime rate for the hours worked over 40 a week. This was reflected on the wage statements that I received.

41. When I was hired, I did not receive a wage notice that included my overtime rate of pay.

42. After I was fired, I filed for unemployment insurance benefits. Even though Mr. Richstone contested my unemployment insurance by claiming that I had abandoned my job, after a hearing, a judge found that I did not leave my job voluntarily.

43. After I was fired, I discovered that Mr. Richstone had his license to practice medicine revoked a while ago. While I was employed, I always believed him to be a doctor. We were required to refer to him as "Doctor Richstone." Mr. Richstone also conducted medical examinations on certain patients and some employees.

44. I never dated Mr. Richstone either before or after I started working in his office. I never voluntarily hugged him; I never kissed him or was physically intimate with him in any way in any place. I certainly never asked him to leave his wife for me! In fact, I was dating someone when I met him and went out of my way to introduce my boyfriend to Mr.

7

Richstone in order to discourage his sexual advances.

45. Although, Mr. Richstone forced me to accept the gifts of a scale and mattress, I never accepted any money for him to help with rent. In fact, I politely refused his offer to help with rent in a text message.

46. On the day I was fired, I took my medical file with me. I believed that I had a right to take it and I was worried that Mr. Richstone would bill my insurance company for the exams that I did not consent to. In fact, I called and reported these activities to my health insurance company's fraud department soon after I was fired.

47. While I was employed, I would have packages delivered to work, as did the other office workers. A package was delivered after I was fired and when I called the office to arrange to pick it up, one of my former coworkers informed me that Mr. Richstone directed her not to give it to me. I called again to arrange to pick up the package and I was refused again. Finally, I showed up with a police officer to retrieve the package and Mr. Richstone finally released it.

48. After I was finally able to get my package from the office, I was told by two of my former coworkers that Mr. Richstone had reported me to the police for taking my own medical file. I was never arrested nor was any complaint filed in criminal court against me. I arranged to return the file to the office through an attorney with The Legal Aid Society, Jaspeth Baker.

49. After I was fired, I had trouble finding another permanent, full-time job. I tried to start my own business but was not successful. Being fired has caused me to struggle financially. The whole ordeal left me feeling extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

Dated:  New York, New York
October 8, 2018

_____
LEONIDES DUVERNY